**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

***vs*.**                      **CRIMINAL ACTION NO. 2:04CR30-1**

**KARL KEVIN HILL,**

       **Defendant.**

**I.**
**Background and Procedural History**

      An indictment was returned on December 15, 2004 charging Defendant, Karl Kevin Hill (hereinafter "Hill") with one count of conspiracy to possess with intent to distribute methamphetamine and marijuana in violation of 21 U.S.C. § 846, one count of possession of firearms in aid of drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1)(A) and a forfeiture allegation.

      Hill was arraigned and detained pending trial which was scheduled to commence on March 3, 2005. (Docket Entry 13).

      Pursuant to the scheduling order, Hill filed his Motion To Suppress (Docket Entry 16) on January 14, 2005. A hearing was held before the undersigned Magistrate Judge on February 8, 2005 which resulted in an Opinion/Report And Recommendation dated February 14, 2005 (Docket Entry 22) suppressing the firearms found within Hill's residence but not suppressing the methamphetamine lab found by police in a trailer located behind and detached from the residence house. Over Hill's and the United States separate objections, the District Judge entered an Order dated March 14, 2005 adopting the Opinion/Report And Recommendation. (Docket Entry 41).

      Trial was rescheduled for April 25, 2005 by Order dated March 17, 2005 (Docket Entry 43).

On March 29, 2005, at the request of Hill, the undersigned entered an order directing Hill be transported from his place of detention to a medical facility he and his family had arranged for treatment. (Docket Entry 47).

Prior to the rescheduled trial, on April 15, 2005, Hill appeared before the District Judge and changed his plea.

On January 17, 2006, the District Judge entered an order (Docket Entry 73) setting Hill's sentencing on March 23, 2006.

On February 13, 2006, Hill filed his first Motion To Withdraw Guilty Plea. (Docket Entry 75). On the same date, Hill's attorney, Sean Murphy, filed his motion for leave to withdraw as counsel. (Docket Entry 76). The United States filed its response in opposition to the Motion To Withdraw Guilty Plea and the District Judge conducted hearings on the issue on February 17, 2006 thereafter taking the matter under advisement.

The District Judge directed the Federal Public Defender to appoint new counsel to represent Hill. Pursuant to that Order, Marjorie Ann McDiarmid was appointed to represent Hill. (Docket Entry 82).

Hill filed his Motion To Reconsider Order (Docket Entry 100 and Docket Entry 108) relating to his Motion To Suppress on March 23, 2006 . The District Judge conducted a hearing with respect to the motion on April 6, 2006 resulting in an Order (Docket Entry 111) referring the outstanding motions (Docket Entries 75, 100 and 108) to the undersigned.

The undersigned conducted hearings on the referred motions on May 9, 2006 and entered an Order relieving Sean Murphy from further representation of Defendant.

**II.**

**<u>Contentions Of The Parties</u>**

**Motion For Reconsideration Of Motion To Suppress:**

    **Hill** contends:

        1)      He refused permission to search his premises, thus the search is barred.

        2)      Ms. Campbell lacked real and apparent "common authority" and thus could not give valid consent to search.

        3)      He had a reasonable expectation of privacy protected by the Fourth Amendment.

        4)      His conduct that evening did not abandon his Fourth Amendment privacy interest.

        5)      Any material seized from the trailer was the fruit of the initial illegal search.

    **United States** contends:

        1)      Hill lacked standing to complain of the search of the trailer because, when asked for consent, he told the police it wasn't his but that it was his sister's.

        2)      Hill's present claim of standing is inconsistent with his stated position on the night in question.

**Motion To Withdraw Guilty Plea**

    **Hill** contends:

        1)      He was in such need for medical treatment that he entered a guilty plea solely to get out of jail to get that medical treatment.

        2)      His guilty plea was the result of coercion and therefore involuntary.

        3)      He is legally innocent of the charge to which he pled guilty.

**<u>III.</u>**
**<u>Discussion And Analysis</u>**

**Motion To Withdraw Guilty Plea**

F.R.Crim.P. 11(d)(2)(B) provides: "A defendant may withdraw a plea of guilty or nolo contendare (2) after the court accepts the plea, but before it imposes sentence if: (B) the defendant can show a fair and just reason for requesting the withdrawal."

"[A] defendant does not have an absolute right to withdraw a gulty plea, even before sentencing." *United States v. Rios-Ortiz*, 830 F.2d 1067 (9th Cir. 1987). "Rather a defendant bears the burden of demonstrating to the district court's satisfaction that a 'fair and just' reason supports his request to withdraw." *United States v. DeFreitas*, 865 F.2d 80, 82 (4th Cir. 1989; *United States v. Haley*, 784 F.2d 1218, 1219 (4th Cir. 1986). "The determination is entrusted to the discretion of the district court." *United States v. Moore*,931 F.2d 245, 248 (4th Cir.) *cert. denied*, 502 U.S. 857, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991).

In determining whether a defendant should be allowed to withdraw his guilty plea**,** trial court must weigh the following factors:

1) whether defendant has offered credible evidence that his plea was not knowing or not voluntary;
2) whether defendant has credibly asserted his legal innocence;
3) whether there has been delay between entering of plea and filing of motion;
4) whether defendant has had close assistance of competent counsel;
5) whether withdrawal will cause prejudice to government; and
6) whether it will inconvenience court and waste judicail resources.

*United States v. Wilson*, 81 F.3d 1300, 1306 (4th Cir. 1996); *United States v. Moore*, *supra* at 248.

Of these factors, the Fourth Circuit has found "that considerations of judicial economy play a strong part in the withdrawal of a guilty plea" because the avoidance of the waste of judicial resources is one of the primary purposes of permitting guilty pleas in lieu of trial. *United States v. Wilson*, *supra* at 1306 citing *McCarthy v. United States*, 394 U.S. 459, 472, 89 S.Ct. 1166, 1174, 22 L.Ed.2d 418, (1969).

"The key to a 32(e) motion is whether or not the Rule 11 proceeding was properly conducted." *United States v. Wilson*, *supra* at 1307. Referring to defendant's claim that he never possessed the intent to conceal the proceeds of a food stamp scheme, the Fourth Circuit commented that, aside from the procedural requirements of Rule 11, the reviewer must determine "whether the appellant believed, at the time of the taking of his plea, that there was a substantial risk that a jury could find that he possessed the requisite intent." In short, the essential purpose of the plea hearing under Rule 11 "is to guarantee that the defendant understands the nature of the charges against him so that he can knowingly and voluntarily agree to plead guilty, rather than face the risk of a reasonable jury finding that he possessed the necessary 'mens rea' and committed the 'actus reus.'" *supra* at 1309). "While most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly consent to the imposition of a prison sentence even if he is unwilling or undable to admit his participation in the acts constituting the crime. Nor can we perceive any material difference between a plea which refused to admit commission of the criminal act and a plea containg a protestation of innocence when, as in the instant case, a defendant intelligently concludes that his interest requires entry of a guilty plea and the record before the judge contains strong evidence of actual guilt." *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 167, 27 L.Ed.2d 163, (1970).

In the instant case, Hill asserts "he did not enter his guilty plea voluntarily. ... that he was under duress when he entered the plea and that he was coerced into pleading guilty." Defendant Karl Hill's Motion To Withdraw Guilty Plea And Memorandum In Support Of Defendant's Motion, (Docket Entry 75) p. 3, pp.12. Hill argues: at the time of his plea he had already been incarcerated for several months during which he requested medical treatment several times which was denied

except for the offer of Tylenol; that the Government promised if he would plead guilty, it would not oppose his motion for bond; and he concluded in his own mind that the only way he could get the medical treatment he desparately wanted and needed was to plead guilty. *Supra* at p. 3-4, pp. 13, 14-17.

Hill did not present any witness testimony and did not take the stand and testify in support of his claim. Hill did not call his former counsel, Sean Murphy, to testify. Instead, in support of his claims, Hill submitted medical records.

**Credible Evidence Of Plea Not Being Knowingly And Voluntarily Made**

The submitted medical records were reviewed by the undersigned and generally reflect the following with regard to a worker's compensation injury:

| | |
|---|---|
| 9/4/97 | Dr. Pavlovich medical report relative to injury to Hill's knee on June 7, 1997 followed by arthroscopic procedure and continuing complaints. Assessed as right knee prepatellar bursitis as well as iliotibial band syndrome with treatment of cortisone injections and warm soaks and stretching. |
| 10/30/97 | Dr. Pavilovich medical report recomending ultrasound treatments, lontophoresis, and possible phonophoresis of Hills preppatellar bursitis as well as iliotibial band syndrome. |
| 12/02/97 | Report of Physical Therapy Service reflecting Hill had 10 PT treatments resulting in full ROM (range of motion), pre-patellar bursa no longer swollen, normal gait but lateral joint line very tender to palpation. |
| 12/2/97 | Report of Dr. Pavlovich confirming reported findings of PT and prescribing cortisone - lidocaine injections for pain in the iliotibial band. |
| 3/17/05 | Grievance filed with Regional Correctional Facility complaining about response to Hill's 2/13/05, 3/9/05, 3/11/05 and 3/15/05 requests to see a doctor re: re-injury to back and knee. |
| 8/2/01 | Report of Dr. Pavlovich noting Hill had sustained injury to left knee while logging. Diagnosed internal derangement of left knee with grade III MCL tear as well as possible PCL injury. |
| 8/15/01 | Follow up report of Dr. Pavlovich relative to Hill's left knee injury assessing internal derangement with multiple ligament injuries. |
| 8/29/01 | Follow up report of Dr. Pavlovich relative to Hill's left knee injury assessing internal derangement and grade III MCL injury and probable PCL injury. |
| 9/19/01 | Follow up report of Dr. Pavlovich relative to Hill's left knee injury assessing internal derangement. |
| 10/24/01 | Follow up report of Dr. Pavlovich relative to Hill's left knee injury assessing multiple ligament injury. |

| | |
|---|---|
| 11/14/01 | Follow up report of Dr. Pavlovich relative to Hill's left knee injury assessing internal derangement with ligamentous instability. |
| 12/12/01 | Follow up report of Dr. Pavlovich relative to Hill's left knee injury indicating that Hill would have a MRI and surgery on Friday to address his internal derangement with medial collateral ligament probable PCL tear. |
| 12/19/01 | Dr. Pavlovich note that Hill's wife called in to get prescription for Hill for percocet. |
| 12/21/01 | Dr. Pavlovich note post op. Hill stated he was doing fine but still had pain. |
| 1/2/02 | Dr. Pavlovich report relative to Hill's left knee surgery to do PCL reconstruction. |
| 1/23/02 | Dr. Pavlovich report relative to Hill's left knee surgery to do PCL reconstruction. |
| 2/26/02 | Dr. Pavlovich post surgery evaluation report. |
| 3/26/02 | Dr. Pavlovich post surgery evaluation report. |
| 4/30/02 | Dr. Pavlovich post surgery evaluation report. |
| 5/28/02 | Dr. Pavlovich post surgery evaluation report. |
| 7/0/02 | Dr. Pavlovich post surgery evaluation report and note that he injected Hill's knee with cortisone. |
| 8/6/02 | Dr. Pavlovich post surgery evaluation report and note that he injected Hill's knee with Hyalgan. |
| 9/5/02 | Dr. Pavlovich post surgery evaluation report. |
| 10/8/02 | dd post surgery evaluation report noting: "On exam today, the patient has a 2+ valgus laxity. He has no varus laaxity. He has a negative Lachman. He has a negative posterior sag. He has a large varicosity over the anterior aspect of his knee. He has a mass over the central portion of his thoracic spine." |
| 11/14/02 | Hill agrees with Dr. Pavlovich's recommendation to have diagnostic arthroscopy as well as MCL exploration. |
| 12/13/03 | Dr. Pavlovich post op evaluation report. |
| 12/16/02 | Dr. Paavlovich prescription note. |
| 1/14/03 | Dr. Pavlovich post surgery follow up for left knee MRSA infection. Dr. Pavlovich noted an open wound measuring 1 ½ x 1 ½ cm. |
| 1/22/03 | Dr. Pavlovich post surgery follow up for left knee MRSA infection. Dr. Pavlovich noted an open wound measuring 1 x 1 cm. |
| 1/29/03 | Dr. Pavlovich post surgery follow up for left knee MRSA infection. Dr. Pavlovich noted an open wound measuring 1 x 1 cm. |
| 2/11/03 | Dr. Pavlovich post surgery follow up for left knee MRSA infection. Dr. Pavlovich noted an open wound measuring 1/2 x 1/2 cm and that the drainage had almost completely resolved (no active drainage). Directed Hill to discontinue taking antibiotics. |
| 3/18/03 | Dr. Pavlovich post surgery follow up for left knee MRSA infection. Dr. Pavlovich noted he had aspirated Hill's knee and sent the culture out for evaluation. |
| 4/8/03 | Dr. Pavlovich noted Hill left without seeing the doctor because he was tired of waiting. |
| 4/17/03 | Dr. Pavlovich post surgery follow up for left knee MRSA infection noting that MCL reconstruction had failed and recommended cadaver graft to the MCL v. a graft taken from his contrlateral knee v. a knee replacement. |
| 6/11/03 | Note of telephone consultation between Dr. Pavlovich again reviewing the treatment options available to Hill. Hill was to consider the options and let the Doctor know whether he wanted to proceed with surgery. |

10/1/03    Dr. Pavlovich follow up examination revealing that Hill was complaining of thorasic pain without radicular symptoms.

On April 15, 2005 Defendant and his counsel, Sean Murphy, signed a written plea agreement dated April 12, 2005. Under the terms of the plea agreement, Hill agreed to "plead guilty to drug conspiracy, marijuana and methamphetamine, as charged in Count One of the Superseding Indictment. Absent any prior felony drug convictions, the maximum statutory penalty Hill agreed to expose himself to was: not les than five years nor more than forty years of imprisonment, a fine of $2,000,000.00 and a term of at least four years of supervised release pursuant to 21 U.S.C. § 841(b)(1)(B). If Hill had a prior felony drug conviction, he agreed that the maximum penalty to which he would be exposed by his plea of guilty was imprisonment for a period of at least ten years to life, a fine of $4,000,000.00 and a term of at least eight years of supervised release pursuant to 21 U.S.C. § 841(b)(1)(B). (Plea Agreement, paragraphs 2 and 3 (Docket Entry 59)).

The plea agreement does not mention release from incarceration pending sentencing for medical treatment.

On the same date, the District Judge conducted a F.R.Crim.P. 11 plea hearing. A review of the transcript of the hearing (Docket Entry 88) reflects the following matters that are relevant to Defendant's motion:

1)  Court:   "Now, have you had an medicine, or drugs, or alcohol in the last 24 hours?
    Hill:    No, sir.
    Court:   Do you read, write, speak and understand the English Language?
    Hill:    Yes, I can.
    Court:   Do you know where you are and what we are doing here today?
    Hill:    Yes, I do.
    Court:   Do you have any hearing or other impairment which would prevent you from fully participating in today's hearing?
    Hill:    No, I do not." p. 5.

2)  As part of the explanation of the penalties Defendant would be exposed to by his plea of guilty, the Court stated:

      "And the Court would note that on March 16, 2005, the United States had

filed an Information of Prior Conviction setting forth that you had one prior felony drug conviction. Now if not dismissed by the Government, this would subject you to the above mentioned higher penalties. Does the Government have an intention or disposition at this time to dismiss the information?

AUSA: Your Honor, not at this time, no. Though we have talked about the possibility in the future as some point, but certainly for now it is not intended. ....

Court: Now Mr. Hill, that prior conviction will play a role in the calculation of your criminal history category under the Sentencing Guidelines and could impact the ultimate sentence imposed in this matter." p. 7.

3) As part of the summarization of the terms of the plea agreement, AUSA Warner also outlined the above penalties that Hill was subjecting himself to by his guilty plea, particularly if he had a prior felony drug conviction. p. 9.

4) AUSA Warner, during summarization of the penalty terms of the plea agreement, asked for a side bar and immediately thereafter made the following statement in the presence of Hill: "Your Honor, we will be asking that this entire proceeding be placed under seal and all of us sitting here before you today have discussed the possibility of - of Mr. Hill engaging in substantial assistance and that's why we would ask that it be under seal to protect him and the intergrity of the ongoing investigation. We think it would be - it has the possibility of being very productive." p. 10.

5) Without objection, the Court granted the motion and placed the matter under seal. AUSA Warner then stated: I did, in fact, file an Information to enhance the sentence based on his prior felony dury conviction. And I want to make it clear that there is absolutely no way I will dismiss that information unless substantial assistance occurs. Now we are all hopeful that that will happen, and that's the goal that we are going to ask that he be released on home confinement today and we are all hopeful that happens, but I just want it clear, although, we have talked about it, there is no way I will dismiss that without substantial assistance. And what I have said is that if substantial assistance occurs, I would urge my office to dismiss that and I think that's a reasonable request. Until obviously my boss has to sign off, but quite frankly, that would be the - the only reasonable thing in exchange for substantial assistance from Mr. Hill." p. 11.

6) After reviewing the non-binding recommendations and non-binding stipulation with Hill, the Court engaged Hill in the following colloquy:

Court: "Now, you understand and agree with the terms of the plea agreement that's before the Court?

Hill: Yes, Your Honor.

Court: Has anything further been agreed to either orally or in writing that is not contained in the plea agreement?

Hill: Pardon, Your Honor.

Court: Has anything further been agreed to either orally or in writing that is not contained in the plea agreement?

Hill: I guess, Your Honor.

Court: All right. Do your want to talk to your attorney about that?" p. 16.

After the conference between Hill and his attorney, counsel asked to Court to inquire again.

Court: "All right. Has anything further been agreed to Mr. Hill, either orally or in

writing that is not contained in the plea agreement?

|  |  |
|---|---|
| Hill: | No, Your Honor. |
| Court: | All right." p. 16-17. |

AUSA Warner then interjected:

|  |  |
|---|---|
| AUSA: | "Your Honor, I'm sorry, if I may. We have suggested and we'll be asking for his release on actually a bond at this point and that's not the plea agreement and that's what the discussions were about. So I do want to make it clear - |
| Court: | In other words, it's not an agreement because you have to submit to the Court for the Court to say yes or no? |
| AUSA: | Yes, sir." p. 17. |

7) After reviewing all of the matters required under F.R.Crim.P. 11 with Hill, and receiving the testimony of a Government witness who provided an independent basis in fact in support of Hill's guilty plea, the Court inquired of Hill:

|  |  |
|---|---|
| Court: | "All right, Mr. Hill, is your tendered plea of guilty in this case here this morning the results of any threats, or coercion, or harassment in any way.? |
| Hill: | No, sir, Your Honor. |
| Court: | Is your plea of guilty that you submitted here this morning the results of promises or inducements other than those contained in the plea agreement and /or cooperation agreement and the matters that have been discussed here this morning.? |
| Hill: | No, Your Honor." p. 27. |

8) After accepting Hill's plea of guilty, the Court and counsel engaged in the following relevant on the record discussions in the presence of Hill concerning his release on conditions:

|  |  |
|---|---|
| Court: | "The Court has been informed that the Defendant is seeking, and the Government supports, possible release on bond so that the Defendant may provide assistance. |
| AUSA: | ... Now as I have mentioned before, I will put this in writing today a motoion and proposed order, this whole thing be under seal. If the Court would grant that, I guess the Court we discussed that already because we do want to sincerely offer him a chance at substantial assistance. We think he is in a unique position in Barbour County to be able to help us in that regard. So with that in mind, I do ask for his release on bond and ask for him to be directed to be living at his girlfriend's house in Barbour County ... ." |

The undersigned was not able to find any mention of Hill's medical condition, pain therefrom, lack of treatment by Hill, his counsel or any other person present in the record of the plea hearing of April 15, 2005. The District Judge encouraged Hill at the outset of the plea hearing to "feel perfectly free to ask any questions that may come to your [Hill's] mind as the Court makes inquiries of you and ask for any explanations that would be helpful to you to understand the questions that are being presented to you and, of course, always feel free to discuss with your

attorney, Mr. Murphy, any matters that come to your mind or your would like to talk to him about before you answer." Hill's "Yes, sir." response clearly indicates he understood. As pointed out in the plea hearing, Hill was a 41 year old male with an 11th grade education who said he was able to read, write, speak and understand English and who had worked as a certified asbestos remover, certified logger and had worked in heating and plumbing around power plants. (Docket Enty 88, p. 5). The plea hearing transcript establishes that the District Judge fully complied with the provisions of Rule 11 and that Hill entered a knowing and voluntary plea of guilty. The undersigned is suspicious of the fact that Hill had the opportunity to call his former counsel, Sean Murphy, to testify at the hearing before the undersigned as to any knowledge Murphy may have had relative to Hill's current claim that he entered a guilty plea to obtain release to get medical treatment and did not do so. Instead, Hill asks the undersigned to make a connection between his pre-existing medical condition, attempts to get treatment while incarcerated and his getting medical attention as soon as he was released on bond after the April 15, 2005 plea hearing and his present claim that his plea was involuntary. To do so, the undersigned would have to engage in rank speculation. To do so the undersigned would have to ignore the compelling evidence in the record of the plea hearing that Hill was released at the request of the AUSA to engage in substantial assistance to the Government in its ongoing investigation of drugs in Barbour County, West Virginia and to increase his chance of the Government making a 5K1.1 motion and possibly avoid the adverse sentencing impact of Hill's prior felony drug conviction. In reaching these conclusions, the undersigned recognizes that it is undisputed that Hill underwent significant knee surgery for his pre-existing condition.

However, the need for the medical treatment was never announced as a stated reason for Hill's entry of a guilty plea until nearly a year after the plea was entered. Accordingly, the undersigned finds

that Hill has failed to offer any credible evidence that his plea was not knowing or not voluntary or that it was coerced.

**Delay**

Hill entered his plea of guilty on April 15, 2005 and was released from custody on the same date to provide substantial assistance to the Government. Between April 15, 2005 and February 13, 2006, Hill filed no claim challenging the voluntariness of his guilty plea. His challenge was not made until after the AUSA announced his office was not going to make a 5K1.1 motion and after the pre-sentence report had been completed. On January 17, 2006, the District Judge entered an order (Docket Entry 73) setting Hill's sentencing on March 23, 2006. On February 13, 2006, Hill filed his first Motion To Withdraw Guilty Plea. (Docket Entry 75). On the same date, Hill's attorney, Sean Murphy, filed his motion for leave to withdraw as counsel. (Docket Entry 76).

Additional proceedings were conducted before the District Judge before he referred the outstanding motions (Docket Entries 75, 100 and 108) and the undersigned conducted hearings on those motions on May 9, 2006.

Finding delay is inescapable. The motivation for the delay is suspicious. Had he been coerced or had he believed the only way he would get out of jail to get medical treatment was to plead guilty, he would have known that was his reason ( motivation) for entering the plea on the date he made it. However, he did not announce that reason until he perceived it was to his advantage to do so. That was approximately 10 months later. It follows that the delay was totally caused by Hill's actions and inaction.

**Close Assistance Of Competent Counsel**

Based on the representations of Defendant's substituted counsel at the hearing of May 9, 2006, there is no dispute that Defendant had the benefit of close representation and assistance of

competent legal counsel (Sean Murphy) at the April 15, 2005 plea hearing. In addition, Defendant had the close and competent representation of Murphy as his counsel through the pre-plea proceedings including but not limited to the successful motion to suppress firearms and the motion to require the U.S. Marshal to provide transportation to and from a private medical appointment.

**Prejudice To The Government**

There is no evidence that the Government would suffer any prejudice by permitting Hill to withdraw his guilty plea.

**Inconvenience To The Court And Waste Of Judicial Resources**

The Court dedicated its time, the time of its immediate support staff (court reporter, law clerk, deputy court clerk, court security**,** secretary, its other support staff, the time of the United State's Attorney's office, the time of Defendant's court appointed legal counsel and his staff to the plea process instead of using that time and those resources to work on other matters pending before the court. To now permit Hill to unnecessarily withdraw his guilty plea, results in a waste of those valuable resourses particularly if the plea was knowingly and voluntarily made and Hill is not legally or actually innocent of the charge to which he pled. *United States v. Wilson*, *supra* at 1306 citing *McCarthy v. United States*, 394 U.S. 459, 472, 89 S.Ct. 1166, 1174, 22 L.Ed.2d 418, (1969).

**Credible Assertion Of Legal Innocense and**
**Motion To Reconsider**

Hill's assertion that he is legally innocent by virtue of the application of the Supreme Court's decision in *Georgia v. Randolph*, 126 S.Ct. 1515 &4 USLW 4176 (March 22, 2006), is without merit. *Randolph* is limited to its peculiar facts. "We hold that, in the circumstances here at issue, a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." *Id.*

Scott and Janet Randolph separated. At some point Janet Randolph returned to the marital

home.  While there, the police were called in response to Janet Randolph's call complaining of a domestic dispute.  When the police arrived, Scott Randolph was not present.  Janet Randolph proceeded to tell the police that Scott used cocaine and his habit caused disputes.  She went so far as to advise the police that Scott had drugs in the house.  Scott returned while the police were there.  The police asked  permission to search.  Janet gave them permission but Scott unequivocally refused.  Based on the permission given by Janet, the police, guided by Janet, began to search the house and found a straw with a while powder residue suspected to be cocaine.  The police contacted the prosecuting attorney who told them to cease the search until a search warrant could be obtained.  The police ceased the search, sought and obtained a search warrant which they later executed.  Scott challenged the search. The Court of Appeals, reversing the District Court, suppressed the materials seized as the fruits of an illegal search.  The Supreme Court affirmed holding:  "[A] warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.*

The facts of the instant case are significantly different than the facts of the *Randolph* case. The police had gone to Hill's residence looking to execute an arrest warrant on Kyle Lantz.  Upon their arrival, an officer spoke briefly with Hill at the door to Hill's residence.  The officer stepped inside the residence without a warrant.  When he did so, a man inside went out the back of the house. Other police apprehended the man who ran out of the house in to the back yard.  The other officers alerted the lead officer, Sergeant Cunningham of a strong smell in the back yard.  Cunningham identified the smell as being consistent with an operational meth lab and determined the smell was emanating from a trailer located approximately thirty-five feet behind and detached from Hill's residence. Cunningham directed that Hill be arrested as a felon in possession of a firearm and asked

Hill for permission to search the trailer. Hill denied the trailer was his or under his control and told the police if they wanted permission to search it, they would have to get that consent from his sister and pointed them in the direction of her house.[1]

Based on his denial, the police had no basis to believe that Hill had any interest in the trailer. The police had no basis upon which to reject Hill's disclaimer of interest and conclude that Hill and his sister had common authority over the trailer. Based on Hill's expressed disclaimer, the police reasonably and properly turned to the person they had been told had the authority to give consent, i.e. Hill's sister.

Hill's sister, Donna Sue Campbell, testified during the hearing held May 9, 2006 to the effect that on the night of the search she told the police: she was the owner of the land on which the trailer was located; the trailer was not titled in her name but had been put on the land by her father before he died intestate; the trailer was used for the storage of old school books; she had not been in the trailer for a couple of years before her brother's birthday party; and, even though she had considered

---

[1] "A. I then went back to the front of the house, advised the guys to go ahead and arrest Mr. Hill on possession of a firearm, a convicted felon, and talked with him more on the trailer about a consent to enter it. He told me it wasn't his. Q. What did he say? A. He told me it wasn't his, it was his sister's. I then asked, okay, where is your sister and he pointed to a light down the holler, that's where she lives. Q. And it was after that point in time where you began to ask him, you know, hey, we need to go out here and look in your trailer, can we do that? A. Yes, I asked him for consent. Q. And he had indicated that you needed to talk to his sister? A. Yes, sir. Motion Hearing Transcript p. 57. Q. And you told her that there was a risk that the thing might explode? A. I informed her what - - what I had found. I informed her that - - she was concerned that her father had - - or they had heirlooms in the trailer that she didn't want destroyed. And I told her our main purpose to go in there was just to make sure that you know there wasn't something on a heat source or something that was going to cause more damage – ... In other words, did you have a discussion with her albeit briefly about forfeiture possibilities? A. I don't recall that, sir. If she asked me, I may have told her you know the answer to her question because she was – she was very inquisitive about you know what was going on so I may have told her that, but I don't recall that in the conversation. ..." Motion Hearing Transcript p. 57-58.

forcing the police to get a search warrant, she decided to consent to the search the police wanted because she did not want the trailer to blow up. After getting a promise that the police would not hurt her brother's big dog and would not tear things up, she signed a make shift consent to search. It is significant to the undersigned that Campbell did not disclaim authority to consent to a search of the trailer.

The facts confronting the police in the instant case are also distinguishable from the facts of *Illinois v. Rodriguez*, 497 U.S. 177 (1990) and *United States v. Matlock*, 415 U.S. 164 (1974) wherein the potential objector to the search was nearby but not invited to take part in the threshold colloquy and therefor lost out to the co-tenant authorized search. Hill did not state that the trailer was his and the police were not to search it. Instead, Hill told the police if they wanted to search the trailer they would have to ask his sister and pointed them in her direction. In essence, Hill was conveniently distancing himself from the trailer by implying his sister controlled it. It makes common sense that the police would take from Hill's statements that he disclaimed interest in the trailer. Any reasonable police officer faced with these facts would correctly conclude that the person in charge of the trailer was Campbell and any consent had to come from her.

Hill challenges any conclusion that the police could have had a reasonable belief that Campbell had "common authority. *Illinois v. Rodriguez, supra* at 188. It is undisputed that "the third party's "common authority" is not synonymous with a technical property interest:

> 'The authority which justified the third-party consent does not rest upon the law of property, with its attendant historical and legal refinement, but rests rather on mutual use of the property be persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched. 415 U.S., at 171, n. 7 (citations omitted).

> "The constant element in assessing Fourth Amendment reasonableness in the consent cases,

then, is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of proerty, cut not controlled by its rules." *Georgia v. Randolph*, *supra*. "'*Matlock*' relied on what was usual and placed no burden on the police to eliminate the possibility of atypical arrangements, in the absence of reason to doubt that the regular scheme was in place." *Id.*

The undersigned finds that the police were justified in accepting Hill's disavowance of control over the trailer as made by him and were not required to look behind his statements. The undersigned finds that acceptance of the disavowal at face value did not require the police to believe that Campbell controlled the methamphetamine lab. The police had reason to accept that Hill disclaimed interest in the trailer and conclude from his statements that his sister had authority and control over it. This conclusion is supported by Cambell's assertion that the trailer was on land she owned and that it was used to store old books since her father's death. A contemporaneous belief by the police that her brother may have used the trailer to manufacture methamphetamine without her knowledge or consent in the years since her last visit to it did not divest Campbell of the appearance of apparent authority to give consent for the warrentless search or the police the right to rely on that apparent authority.

The record evidence is clear on the disavowal: "A. I then went back to the front of the house, advised the guys to go ahead and arrest Mr. Hill on possession of a firearm, a convicted felon, and talked with him more on the trailer about a consent to enter it. He told me it wasn't his. Q. What did he say? A. He told me it wasn't his, it was his sister's. I then asked, okay, where is your sister and he pointed to a light down the holler, that's where she lives. Q. And it was after that point in time where you began to ask him, you know, hey, we need to go out here and look in your trailer, can we do that? A. Yes, I asked him for consent. Q. And he had indicated that you needed

to talk to his sister?  A.  Yes, sir."  Motion Hearing Transcript p. 57.  Hill nor any other witness testified to the contrary.  The only premises that Hill unequivocally refused consent to search was his residence and he did so with colorful language.

"The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence."  *United States v. Wilhelm*, 80 F.3d 116 (4th Cir. 1996).  "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972).  "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion."  *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961).  Since we hold to the "centuries-old principle of respect for the privacy of the home," *Wilson v. Layne*, 526 U.S. 603, 610 (1999), "it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people," *Minnesota v. Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring).  *Georgia v. Randolph*, *supra.*  "We have after all, lived out whole national history with an understanding of the 'ancient adage that a man's home is his castle [to the poinbt that t]he poorest man may in his cottage bid defiance to all the forces of the Crown," *Miller v. United States*, 357 U.S. 301, 307 (1958) (internal quotation marks omitted).  *Georgia v. Randolph, supra.*

"To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable per se, one 'jealously and carefully ddrawn' exception, recognizes the validity of searches with the voluntary consent of an individual possessing authority.  That person might be the householder against whom evidence is sought, or a fellow occupant who shares common authority over property, when the suspect is absent and the exception for consent extends

even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." (Internal citations omitted). *Georgia v. Randolph*, *supra*.

Under a totality of the circumstances (Cambell's statements that the trailer was on her land; was used to store old books since her father's death; her failure to disclaim control over the trailer) the undersigned finds that the police were justified and acted reasonably in their reliance on the disavowal of Hill and the apparent authority of Campbell to consent to the warrantless search of the trailer. Accordingly, there is no reason to reconsider the prior order denying the suppression of the evidence seized incident to the trailer search.

Based on the foregoing, the undersigned concludes Defendant Hill has failed to credibly assert either his actual or legal innocense.

The undersigned further concludes that Defendant Hill has failed to "show a fair and just reason for requesting the withdrawal" of his guilty plea.

## IV.
## Recommendation

For the reasons stated herein, the undersigned **RECOMMENDS** Defendant's Motion To Reconsider Order (Docket Entries 100 108) and Defendant's Motion To Withdraw Guilty Plea. (Docket Entry 75) be **DENIED** and that Defendant's sentencing be expeditiously rescheduled.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the proposed Report and Recommendation to which objection is made and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the proposed Report and Recommendation

set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the United States District Court for the Northern District of West Virginia is directed to mail an authenticated copy of this proposed Report and Recommendation to counsel of record.

DATED: June 6, 2006

/s *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE